# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**VONNE HARRISON CARTER**, *et al.*,

     **Plaintiffs,**

v.                                 **Civil Action No. 3:16cv661**

**VIRGINIA DEPARTMENT OF GAME
AND INLAND FISHERIES**, *et al.*,

     **Defendants.**

## MEMORANDUM OPINION

This matter comes before the Court on two motions filed by Defendants Virginia Department of Games and Inland Fisheries ("VDGIF"), Virginia Department of Human Resources Management ("VDHRM"), and VDGIF Executive Director Robert W. Duncan (collectively, the "Defendants"): (1) the "Partial Motion to Dismiss Plaintiffs' Complaint" (the "Partial Motion to Dismiss"), (ECF No. 6); and, (2) the "Motion to Disqualify Plaintiff's [sic] Counsel" (the "Motion to Disqualify"), (ECF No. 14). Plaintiffs Vonne Harrison Carter, Dr. Joice Eaddy Conyers, Charlene Thomas Easter, and Carol King-Robinson (collectively, the "Plaintiffs") responded to the Partial Motion to Dismiss, (ECF No. 10), and the Defendants replied, (ECF No. 12). The Plaintiffs responded to the Motion to Disqualify, (ECF No. 17), and the Defendants replied, (ECF No. 19).

The matters are ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. For the reasons that follow, the Court will deny the Motion to Disqualify and grant in part the Partial Motion to Dismiss.

## I. Factual and Procedural Background

### A.    Summary of Allegations in the Complaint[1]

Each of the four Plaintiffs identifies herself as "black" and works or has worked at

VDGIF for the time period stated in the Complaint: VDGIF employed Ms. Carter from January

2010 until October 2014; VDGIF employed Dr. Conyers from December 2009 until January

2015; VDGIF has employed Ms. Easter since January 2014; and, VDGIF has employed Ms.

King-Robinson since November 2013. Defendant VDGIF maintains responsibility for

management and law enforcement regarding inland fisheries, wildlife, and recreational boating

throughout the Commonwealth of Virginia. Defendant VDHRM acts as the central human

resource agency for the Virginia government.

The Court will outline the Plaintiffs' general allegations, followed by the allegations as

they pertain to each plaintiff individually.

### 1.    General Discriminatory Hiring Standards and Practices at VDGIF

The Complaint alleges that "[e]ach Plaintiff observed VDGIF recruitment and/or hiring

practices in which [whites] were disproportionately hired and/or promoted." (Compl. ¶ 55, ECF

No. 10.) Generally, the Plaintiffs assert that "VDGIF engaged in a practice of initially hiring

largely or wholly from [white] candidates and promoting largely or wholly from among [white]

employees already employed by VDGIF." (*Id.*) Specifically, VDGIF agents advised the

Plaintiffs that VDGIF did not hire minority candidates for officer positions in order to avoid

potential confrontations with white citizens.

When VDGIF did hire a minority applicant, VDGIF would treat that minority employee

differently and subject him or her "to discriminatory treatment, practices, and harassment that

---

[1] For purposes of the Partial Motion to Dismiss, the Court will assume the well-pleaded factual allegations in the Complaint to be true and will view them in the light most favorable to the Plaintiffs. *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

employees of other races did not experience." (*Id.* ¶ 57.) On one occasion during Ms. Carter's employment, a white employee intentionally failed to properly record a disciplinary action against another white employee. When Ms. Carter noted the failure, the white employee directed her to "throw away" the record. (*Id.* ¶ 58.) Ms. Carter reported the incident to VDGIF management, but the obstructing white employee never underwent investigation or received a reprimand.

On a separate occasion when Ms. Carter worked at VDGIF, a different white employee made a major error related to a program through which past Commonwealth of Virginia employees could "purchase" previous years of service for the benefit of their retirement plans. (*Id.* ¶ 59.) When Ms. Carter discovered the mistake, she advised both Dr. Conyers and VDGIF Deputy Director Gary Martel, who is Caucasian, in order to remedy the situation. However, "[u]pon information and belief,"[2] VDGIF never counseled or disciplined that employee. (*Id.* ¶¶ 59, 99.)

At a time not identified in the Complaint, VDGIF implemented a policy that required applicants for a VDGIF officer position "to be able to swim at the time of application." (*Id.* ¶ 60.) Ms. Easter commented during a VDGIF recruitment meeting in 2014 that such a requirement, applied without an opportunity for job training, could have a disparate effect on minority applicants. Ms. Carter and Dr. Conyers observed Ms. Easter being ostracized and berated for her comment. VDGIF ignored Ms. Easter's suggestion.

---

[2] "A plaintiff is generally permitted to plead facts based on 'information and belief' if such plaintiff is in a position of uncertainty because the necessary evidence is controlled by the defendant." *Ridenour v. Multi–Color Corp.*, 147 F. Supp. 3d 452, 456 (E.D. Va. 2015) (citing *Raub v. Bowen*, 960 F. Supp. 2d 602, 615 (E.D. Va. 2013) (noting that although "information and belief" pleadings are "tenuous at best," such practice is permitted under Rule 8(a) when relying "on second-hand information to make a good-faith allegation of fact")).

Ms. King-Robinson, meanwhile, observed that when white coworkers made errors, the person who learned of the error typically met with them informally to resolve the issue. On the other hand, when a black employee made an error, management would be immediately notified in writing.

In early 2014, VDGIF hired two additional black employees, one permanent and one temporary. In January of 2014, VDGIF hired Ms. Easter into a full-time position and then, in July 2014, hired Val Thompson on a temporary, part-time, basis. Dr. Conyers observed that white employees became very upset at the growing number of black employees. Ms. Carter heard one white employee state something similar to: "I can't believe it, can Joice [Conyers] make this office any blacker!?" (*Id.* ¶ 64.) Another Caucasian employee stated that she and other VDGIF employees felt that Dr. Conyers intended "to turn the agency 'black.'" (*Id.* ¶ 65.) "[T]ension and discrimination had increased markedly" by September 2014. (*Id.* ¶ 66.) Some white employees even staged a boycott and refused to perform assigned work, including "assisting in the processing and hiring of 28 new VDGIF Officers." (*Id.*) These employees walked out without requesting leave. Ms. Carter and Ms. Easter ultimately had to assume the boycotting employees' work.

Ms. Carter and Ms. Easter then complained to Dr. Conyers, who addressed their issues with VDGIF Executive Director Robert Duncan, who is Caucasian. Director Duncan, however, did not satisfactorily address those issues and "additional retaliation ensued." (*Id.* ¶ 71.) "Upon information and belief," VDGIF did not discipline or reprimand the boycotting employees. (*Id.* ¶ 72.)

### 2. Vonne Carter, Administrative Office Specialist/Human Resources Analyst

In January 2010, VDGIF hired Ms. Carter in its Richmond, Virginia, office as an "Administrative Office Specialist 3." (Compl. ¶ 18.) At the time of her termination in October 2014, Ms. Carter had the title of "Human Resources Analyst 2." (*Id.*) Ms. Carter's initial supervisor, Colonel Dabney Watts, a white male, "often cursed and screamed at Ms. Carter, kicked office furniture, and stated repeatedly 'I own you,' or words to the same effect." (*Id.* ¶ 26.) Colonel Watts did not treat white employees in the same manner as he treated Ms. Carter. The Complaint alleges, "[u]pon information and belief," that Colonel Watts treated Ms. Carter in that manner because of her race. (*Id.* ¶ 27.) After an employee other than Ms. Carter reported Colonel Watts's behavior to Dr. Conyers (herself a VDGIF supervisor), an internal investigation ensued, and VDGIF placed Ms. Carter on leave. Colonel Watts received only a brief write-up regarding his inappropriate behavior in a performance evaluation. He received no formal discipline and immediately returned to his former position.

VDGIF transferred Ms. Carter to the human resources department. VDGIF did not do so at Ms. Carter's request, but to punish her. Caucasian employees then "routinely ostracized Ms. Carter," which affected Ms. Carter's ability to perform her duties. (*Id.* ¶ 31.) White employees declined to speak to Ms. Carter and denied her proper job training. A Caucasian employee and Ms. Carter initially were slated to work opposite days while sharing an office space. The Caucasian employee, however, expressed distaste at having to share an office chair, computer, and files with Ms. Carter. The Caucasian employee even stated to Dr. Conyers, "If she [Vonne Carter] is coming down here, I am leaving. I will not share this space!" (*Id.* ¶ 32.) "Upon information and belief," the white employee's distaste stemmed from Ms. Carter's race, as they had not met. (*Id.*) On the day Ms. Carter began working, the white employee handed her letter

of resignation to Dr. Conyers. Upon information and belief, VDGIF rehired that employee shortly after Ms. Carter's termination and paid the white employee an hourly wage much higher than Ms. Carter, even though Ms. Carter had assumed additional job duties while serving in the same position.

VDGIF ultimately assigned Ms. Carter to the Law Department of VDGIF as a liaison. Colonel Henry, Colonel Watts's successor, similarly treated Ms. Carter in a disrespectful manner. Colonel Henry regularly cursed at Ms. Carter and referred to her as "gal" in a derogatory fashion. Colonel Henry did not treat white employees in the same way. On information and belief, VDGIF treated Ms. Carter differently because of her race. In spite of the challenges faced by Ms. Carter in her role as liaison, she excelled, and Dr. Conyers routinely gave her additional responsibilities.

VDGIF terminated Ms. Carter's employment on or around October 22, 2014, two days prior to the completion of her twelve-month probationary period. VDGIF, through its agent, Deputy Director Martel, advised Ms. Carter that the screening for her position was not completed properly, she was not "minimally qualified" for her job duties, and she had "work performance issues." (*Id.* ¶ 98.) Ms. Carter alleges that she "was an excellent worker" and "well qualified for her position." (*Id.* ¶ 99.) Prior to her termination, she had received no warning or reprimand, or faced any disciplinary actions. In fact, Deputy Director Martel could not provide her with any examples of her alleged work performance issues. Armed officers escorted Ms. Carter from the VDGIF office. Following termination of her employment, Ms. Carter filed a Dismissal Grievance with VDGIF. VDGIF, however, denied her access to the grievance process.

6

### 3.    Joice Conyers, Human Resources Director

In December 2009, VDGIF hired Dr. Conyers as "Human Resources Director." (Compl. ¶ 19.) Dr. Conyers held that title until her termination in January 2015. During her employment at VDGIF, Dr. Conyers was the only female director and also the only minority director.

White employees frequently referred to Dr. Conyers as a "blue card," which intended to convey that VDGIF hired her because of her race and not her job qualifications.[3] (*Id.* ¶ 39.) At a human resources retreat, some white employees balked at diversity training and became upset when asked to participate. Caucasian employees, including Mereme Martin and Cleva Pierce, specifically challenged Dr. Conyers's authority and refused to perform assigned tasks. Moreover, Ms. Carter and Ms. Easter routinely observed white employees speaking about Dr. Conyers in derogatory ways.

VDGIF routinely excluded Dr. Conyers from or did not advise her about important management meetings, including critical budget meetings, which negatively affected Dr. Conyers's ability to perform her work duties. All other VDGIF directors participated in such meetings. VDGIF also paid Dr. Conyers less than similarly situated, non-African-American directors at VDGIF. VDGIF paid Dr. Conyers the least of any director because of her race. Dr. Conyers's temporary replacement, a white male, received, on information and belief, a higher salary than Dr. Conyers.

"Dr. Conyers raised her concerns about employee insubordination, her exclusion from important management communications and meetings, and disparate pay, with . . . Director Duncan and with Human Resources Consultant/VDHRM employee Debbie Howe, both of whom

---

[3] According to the Complaint: "The term derives from a blue document received by employees who have been laid off by a Virginia agency but receive a hiring preference in another agency." (*Id.* ¶ 39.) While Defendants introduce a race-neutral definition of "blue card" in their motion, the Court will view facts favorably to the non-moving party here.

identify their race as [Caucasian]." (*Id.* ¶ 46.) In March 2014, Dr. Conyers specifically discussed with Director Duncan certain errors she discovered regarding the computer system as well as the insubordination by two white VDGIF human resources employees: Cleva Pierce and Mereme Martin. Dr. Conyers advised Director Duncan that Ms. Pierce and Ms. Martin refused to properly perform legitimate tasks assigned to them by Dr. Conyers, that they often challenged Dr. Conyers's authority, and that they acted disrespectfully. Dr. Conyers also submitted a salary study to Director Duncan, illustrating her disparate pay. Director Duncan ultimately referred Dr. Conyers to Ms. Howe, and in April 2014, Dr. Conyers expressed the same concerns to Ms. Howe. Ms. Howe advised Dr. Conyers that she was "good friends" with Ms. Pierce and Director Duncan and, for that reason, she declined to consider Dr. Conyers's concerns. (*Id.* ¶ 49.)

Later in April 2014, Dr. Conyers revisited the issue with Director Duncan and advised him about her concerns regarding the lack of diversity in the office. Director Duncan abruptly ended the conversation without addressing the issue. Then, in May 2014, Ms. Howe advised Dr. Conyers that Howe was "auditing" the VDGIF department. (*Id.* ¶ 51.) Ms. Howe ignored Dr. Conyers's earlier reports of insubordination in the office and, instead, launched an investigation, which the Complaint alleges had "the sole purpose of discrediting Dr. Conyers and other Black VDGIF human resources employees, including the other Plaintiffs." (*Id.*) On information and belief, Director Duncan and others opened the "audit" or "investigation" as a "farce." (*Id.*) On or around July 8, 2014, Ms. Howe submitted her "audit" or "investigation" results, which led to the eventual termination of Dr. Conyers and Ms. Carter.

The Complaint alleges, on information and belief, that a number of white employees filed false complaints against Dr. Conyers and the other Plaintiffs because of their race. Following those complaints, in September 2014, VDGIF placed Dr. Conyers on leave pending the

investigation. At the time she was placed on leave, armed officers escorted Dr. Conyers from the building.

VDGIF employee Kim Lettner, Special Assistant to the Director, who is Caucasian, completed an investigation which faulted Dr. Conyers for the hiring of minority employees Ms. Carter, Ms. Easter, Ms. Thompson, and Estella Randolph. Dr. Conyers submitted a written response refuting the accusations. Notwithstanding Dr. Conyers's response, VDGIF issued her a "Group III Written Notice" and terminated her employment in January 2015. (*Id.* ¶ 96.) VDGIF asserted failure to perform job duties and/or failing to follow VDGIF policies as the basis for Dr. Conyers's termination.

### 4. Carol King-Robinson, Boating Services Technician

VDGIF hired Ms. King-Robinson in November 2013 as a "Boating Services Technician." (Compl. ¶ 21.) VDGIF promoted Ms. King-Robinson but later demoted her, and Ms. King-Robinson currently holds the title of "Boating Services Technician." (*Id.*)

In July 2014, Ms. King-Robinson, then working as a Boating Services Technician, applied for a promotion to the position of Licensing Specialist. Upon information and belief, VDGIF human resource professional Ms. Easter served on the selection panel for that position along with two white males, Ryan Brown and Tom Guess. All three individuals determined that Ms. King-Robinson was the most qualified candidate, and VDGIF offered her the promotion over two white candidates. Upon information and belief, several white employees opposed that decision because of Ms. King-Robinson's race. Those employees believed that VDGIF was hiring and promoting "too many" black individuals. (*Id.* ¶ 75.) Ms. King-Robinson accepted the position of Licensing Specialist, which increased her responsibilities and her pay.

When Ms. King-Robinson commenced her new position in August 2014, she encountered increased animosity from white coworkers. VDGIF provided Ms. King-Robinson with a dirty

office filled with trash and debris. Ms. King-Robinson alleges, on information and belief, that a part-time worker had been utilizing that office space and had attempted to clean it prior to departure. But VDGIF agents advised her that "if [Ms. King-Robinson] wanted the office cleaned, she would have to clean it herself." (*Id.* ¶ 77.) A Caucasian human resources employee informed Ms. King-Robinson's coworkers that Ms. King-Robinson was "not a real supervisor," and Ms. King-Robinson's coworkers shunned her. (*Id.*) At odds with the general practice of the office in place before Ms. King-Robinson's arrival and reestablished after her departure, Ms. King-Robinson's coworkers shut their office doors after her promotion because of Ms. King-Robinson's race.

In December 2014, Deputy Director Martel expressed frustration regarding Ms. King-Robinson's promotion, and VDGIF advised Ms. King-Robinson of her demotion to Boating Services Technician. VDGIF agents Dorita Adams, Guess, Linda Thorp, and Lee Walker proffered, as the basis for the demotion, that the promotion contravened VDGIF rules and that VDGIF intended to eliminate the duties that Ms. King-Robinson performed. In February 2015, George Gardner, EEO representative at VDHRM, informed Ms. King-Robinson that her "promotion was eliminated due to the total and complete incompetence of the former Human Resources staff." (*Id.* ¶ 81.) EEO Representative Gardner stated that Ms. King-Robinson "had not suffered a loss" due to the demotion because she could revert to her "former position." (*Id.*) VDGIF informed Ms. King-Robinson that she had to accept a corresponding reduction in pay or lose her employment altogether. "Upon information and belief, the proffered reasons for the demotion were pretextual, and the demotion was due to Ms. King-Robinson's race." (*Id.* ¶ 83.) VGDIF reassigned Ms. King-Robinson's job duties to various white co-workers, who received either temporary or permanent pay increases.

After the demotion, Ms. King-Robinson contacted Ms. Howe and EEO Representative Gardner to complain. Ms. Howe and Mr. Gardner discouraged her from filing a complaint or internal grievance. Ms. King-Robinson nonetheless filed an internal grievance that remains pending. Ms. King-Robinson "performed her duties well at all times and met or exceeded VDGIF's legitimate business expectations." (*Id.* ¶ 86.)

### 5. Charlene Easter, Human Resources Analyst

VDGIF hired Ms. Easter in January 2014 and continues to employ her as a "Human Resources Analyst II/Human Resources Business Analyst." (Compl. ¶ 20.) VDGIF "ostracized and retaliated against [Ms. Easter] for questioning the racial fairness of the swimming requirement for officers." (*Id.* ¶ 103.) Ms. Carter and Dr. Conyers observed Ms. Easter being ostracized for her comment. In 2014, Ms. Easter "openly assisted Ms. Carter in a grievance process" for which no redress was received. (*Id.* ¶ 105.) Due to resulting stress, Ms. Easter's physician placed her on short term disability leave from October 6, 2014, through April 2, 2015. Ms. Easter also has been prescribed medications for depression, anxiety, and sleep deprivation.

Beginning in 2014 and prior to her medical leave, VDGIF permitted Ms. Easter to work a flexible schedule and to occasionally telecommute. Ms. Easter had requested the flex schedule because she is a single parent. When Ms. Easter returned to work after her medical leave, VDGIF denied any return to the flex schedule. When Ms. Easter again requested the flex schedule and the opportunity to temporarily telecommute, VDGIF denied her request. Ms. Easter then observed that all human resources staff files had been relocated to Deputy Director Martel's office. As a result, VDGIF now required that Ms. Easter request specific permission from Deputy Director Martel each time she needed to access a file, while, on information and belief, white employees maintained access. Also on Ms. Easter's return, her coworkers eavesdropped on her telephone communications via an interoffice group telephone system. On

one occasion, a coworker accidentally forwarded an email detailing the eavesdropping to Ms. Easter herself instead of Bill Brenzovich, the intended recipient.

Before her return to work, Ms. Easter had been approved for training and professional development activities by Dr. Conyers. Linda Thorp, however, refused to register Ms. Easter for any training or professional development opportunities. Ms. Easter observed that VDGIF advised white coworkers of training opportunities and encouraged them to attend. Ms. Easter complained about such disparate treatment and VDGIF ultimately approved her to attend a training program in September 2015.

Fearing for the safety of her job, Ms. Easter applied for open positions posted through VDHRM at other agencies within the Commonwealth of Virginia. She estimates that she has applied for more than two dozen positions between 2014 and August 2016, when Plaintiffs filed the Complaint. Ms. Easter alleges that, even though she has been overly qualified for many of those positions, she has rarely received interviews. Ms. Easter believes that she has been "barred" or "blackballed" by VDGIF and VDHRM because of her race, her complaints, or her participation in the complaints and investigations of other minority employees at VDGIF. (*Id.* ¶ 114.)

### B.   Procedural History

All Plaintiffs bring the four following causes of action:

Count I:    Claim of Title VII Racial Discrimination against VDGIF and VDHRM

Count II:   Claim of Title VII Hostile Work Environment against VDGIF and VDHRM

Count III:  Claim of Title VII Retaliation against VDGIF and VDHRM

Count IV:   Claim of § 1983 Racial Discrimination, Hostile Work Environment and Retaliation against Duncan in his Individual Capacity

In total, with three claims by four plaintiffs against two defendants and one claim by four plaintiffs against another defendant, the Plaintiffs assert 28 claims.[4] In the Partial Motion to Dismiss, the Defendants accuse the Plaintiffs of filing "a 'shotgun' style . . . pleading to jumble facts together and confuse legal claims.'" (Mem. Supp. Partial Mot. Dismiss 2, ECF No. 7.) With this characterization as the backdrop to their argument, the Defendants seek to dismiss 26 of the Plaintiffs' 28 claims. The Defendants *do not* seek dismissal of Dr. Conyers's Title VII claim for retaliation against VDGIF or Ms. King-Robinson's Title VII claim for racial discrimination against VDGIF.

The Plaintiffs, in response, defend their litigation style, noting that "[t]here exist four narratives in this matter, but only one story." (Opp'n Partial Mot. Dismiss 2, ECF No. 10.) The Plaintiffs further portray the Complaint as being "divided into multiple sections for ease of reference and organization of information." (*Id.* at 3.)

In the Motion to Disqualify, the Defendants seek to disqualify the Plaintiffs' counsel because Dr. Conyers served as VDGIF's Human Resources Director at all times relevant to Ms. Carter's, Ms. Easter's, and Ms. King-Robinson's claims. According to the Defendants, Dr. Conyers "will be *required* to testify and/or defend [V]DGIF's employment practices to refute allegations pled by Carter, Easter[,] and King-Robinson." (Mem. Supp. Mot. Disqualify 2, 5, ECF No. 15 (emphasis added).) Thus, the Defendants posit, a conflict of interest cannot be avoided. The Plaintiffs counter that "[n]o conflict of interest exists" and that "even if [one] did," the Plaintiffs have waived it. (Opp'n to Mot. Disqualify 2, ECF No. 17.)

---

[4] Defendants aver that Plaintiffs allege 36 claims. The Court counts only 28 claims.

## II. Analysis: Motion to Disqualify

Because the Motion to Disqualify, if granted, would significantly impact this litigation moving forward, the Court addresses it first. The Defendants argue that the Court must disqualify the Plaintiffs' counsel from representing all four plaintiffs because each plaintiff has a non-waivable conflict of interest. The Defendants specifically assert that these non-waivable conflicts arise out of the representation of Dr. Conyers. The Defendants submit: "[T]he hostile work environment claims asserted by Carter, Easter, and King-Robinson will rise or fall on the actions taken by Conyers as HR Director for [V]DGIF." (Mem. Supp. Mot. Disqualify 4.)

Although a conflict of interest *could* arise under the peculiar circumstances of this case, such a conflict can be waived and has been properly waived in writing here. Critically, no plaintiff in this matter has made any assertion or claim against any other plaintiff. Moreover, the Plaintiffs' counsel has indicated that he will "be able to provide competent and diligent representation to each affected client." (Opp'n to Mot. Disqualify 6.) No law prohibits joint representation. For the reasons that follow, the Court will deny the Motion to Disqualify.

### A. Motion to Disqualify Standard

Because a motion seeking to disqualify counsel can be used improperly "for purely strategic purposes," the moving party "bears a 'high standard of proof.'" *Tessier v. Plastic Surgery Specialists, Inc.*, 731 F. Supp. 724, 729 (E.D. Va. 1990) (quoting *Gov't of India v. Cook Indus. Inc.*, 569 F.2d 737, 739 (2d Cir. 1978)). Indeed, the disqualification of counsel is a "drastic" measure that should be free from "overly-mechanical adherence to disciplinary canons at the expense of litigants' rights freely to choose their counsel." *Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142, 146 (4th Cir. 1992).

Thus, while in a close case, doubts are to be resolved in favor of disqualification, *United States v. Clarkson*, 567 F.2d 270, 273 n.3 (4th Cir. 1977), disqualification may not rest on "mere

14

speculation" of a theoretical occurrence, *Shaffer*, 966 F.2d at 145, but rather "some stronger objective indicator . . . than simple judicial intuition is needed to warrant the drastic step of disqualification of counsel," *id.* at 145–46. The disqualification of a party's chosen counsel is a serious matter that should be undertaken only upon a showing by the moving party that an "actual or likely" conflict of interest exists, rather than a "mere possibility of a conflict." *Richmond Hilton Assocs. v. City of Richmond*, 690 F.2d 1086, 1089 (4th Cir. 1982).

## B.   The Virginia Rules of Professional Conduct Apply to this Case

Pursuant to the Local Rules of the United States District Court for the Eastern District of Virginia, "[t]he ethical standards relating to the practice of law in civil cases . . . shall be Section II of Part Six of the Rules of the Virginia Supreme Court as it may be amended or superseded from time to time." E.D. Va. Loc. Civ. R. 83.1(I). Virginia Rule of Professional Conduct 1.7, which governs conflicts of interest, pertains here. That rule provides:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> (1) the representation of one client will be directly adverse to another client; or
>
> (2) there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
>
> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if each affected client consents after consultation, and:
>
> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>
> (2) the representation is not prohibited by law;

15

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and[,]

(4) the consent from the client is memorialized in writing.

Va. R. Prof'l Conduct 1.7. The commentary to Virginia Rule of Professional Conduct 1.7 directly addresses "Conflict[s] Charged by an Opposing Party":

> Resolving questions of conflict of interest is primarily the responsibility of the lawyer undertaking the representation. In litigation, a court may raise the question when there is reason to infer that the lawyer has neglected the responsibility. . . . *Where the conflict is such as clearly to call in question the fair or efficient administration of justice, opposing counsel may properly raise the question.* Such an objection should be viewed with caution, however, for it can be misused as a technique of harassment.

Va. R. Prof'l Conduct 1.7 cmt. 9 (emphasis added). The language of and comments to Rule 1.7, coupled with the principles set forth above by the United States Court of Appeals for the Fourth Circuit, guide the Court's disqualification determination here.

### C. To the Extent a Conflict of Interest Exists, the Plaintiffs Have Waived It

The Court first notes that the Defendants do not seem to bring this motion for "strategic" purposes, nefarious or otherwise. Instead, the case presents unusual facts: a plaintiff joins others in claiming discrimination in an agency for which she served as HR Director during the time some of the discriminatory events purportedly occurred. Defendants appropriately raise the issue of conflict early in the proceeding so that the Court can address it.

Under Virginia Rule of Professional Conduct 1.7(a)—subject to the exception contained in subsection (b)—"a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." Va. R. Prof'l Conduct 1.7(a). As noted above, "[a] concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or[,] (2) there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client." *Id.* Here, the Plaintiffs'

counsel argues that his representation readily meets the exception under subsection (b). Accordingly, the Court addresses that argument first.

Rule 1.7(b) permits representation over "a concurrent conflict of interest" if the purportedly conflicted parties can satisfy five conditions. The Plaintiffs have satisfied all five here. Indeed, the Defendants suggest a violation of only one requirement: the fourth, which speaks to adverse parties.

First, Rule 1.7(b) mandates that "each affected client consents after consultation." Va. R. Prof'l Conduct 1.7(b). In this case, all four plaintiffs consented to multiple client representation. (*See* Letter from Thomas E. Strelka to Vonne Carter, Charlene Easter, Carol King-Robinson, and Joice Conyers, signed by each plaintiff (October 1, 2015), ECF No. 17-2; *see also* Decl. of Vonne Harrison Carter ¶ 19, ECF No. 17-5; Decl. of Joice Eaddy Conyers ¶ 33, ECF No. 17-6; Decl. of Charlene Thomas Easter ¶ 19, ECF No. 17-7; Decl. of Carol King-Robinson ¶ 20, ECF No. 17-8.) The Plaintiffs' consent also meets the fifth proviso, which requires that consent be memorialized in writing. *See* Va. R. Prof'l Conduct 1.7(b)(4).

Second, Rule 1.7(b) requires that "the lawyer reasonably believe[] that [he or she] will be able to provide competent and diligent representation to each affected client." Va. R. Prof'l Conduct 1.7(b)(1). Not only has the attorney sought input from the Virginia State Bar on this matter, (*see* Message from Thomas E. Strelka to Virginia State Bar Ethics Hotline (Nov. 21, 2016), ECF No. 17-3), Plaintiffs' counsel has repeatedly asserted that he can adequately represent each client, (*see, e.g.*, Letter from Thomas E. Strelka to Gregory Fleming and Ryan Hardy (Nov. 10, 2016), ECF No. 17-1). Third, Rule 1.7(b) provides that the representation cannot be prohibited by law. Va. R. Prof'l Conduct 1.7(b)(2). Nothing here indicates that the Plaintiffs' counsel's representation violates the law.

The fourth circumstance is met if "the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal." Va. R. Prof'l Conduct 1.7(b)(3). Here, the Defendants suggest that "directly adverse" parties exist in this case. The Defendants argue that "the hostile work environment claims asserted by Carter, Easter, and King-Robinson will rise or fall on the actions taken by Conyers as HR Director for [V]DGIF." (Mem. Supp. Mot. Disqualify 4.) The Defendants also acknowledge, as they must, that "Carter, Easter[,] and King-Robinson *have not asserted a direct claim* against Conyers." (*Id.* (emphasis added).) In response, Plaintiffs' counsel suggests that testimony from Dr. Conyers, rather than being adverse, will likely support the other Plaintiffs' claims. It is clear that, at the very least, "the representation does not involve the assertion *of a claim* by one client against another client represented by the lawyer in the same litigation." *See* Va. R. Prof'l Conduct 1.7(b)(3) (emphasis added).

After evaluating the five factors implicated by Rule 1.7(b), the Court concludes that the Plaintiffs' counsel's representation falls within the exception articulated in Rule 1.7(b). The Court declines the Defendants' request to disqualify the Plaintiffs' counsel. No direct conflict appears on the record, and to the extent a "concurrent conflict of interest" could exist under the Virginia Rules of Professional Conduct, Plaintiffs' counsel has complied with the requirements needed to proceed in this case. Because the Court otherwise sees no basis for disqualification, the Court will deny the Motion to Disqualify.[5]

### III. Analysis: Partial Motion to Dismiss

Because the Plaintiffs allege a remarkably large number of claims—28—which they tether loosely to the facts, the Court must assure it is not guessing about *exactly how* the

---

[5] Of course, Plaintiffs' attorney must notify the Court *immediately* if an actual conflict arises during the course of litigation.

Defendants wronged the Plaintiffs. At this stage in the litigation, the Court must assume the well-pleaded factual allegations in the Complaint to be true and view them in the light most favorable to the Plaintiffs. *Matkari*, 7 F.3d at 1134. Even doing so, the Plaintiffs' Complaint warrants the dismissal of 22 claims.

For the reasons that follow, the Court will grant the motion to dismiss as to: Ms. Carter's and Ms. Easter's Title VII race discrimination claims (Count I) against VDGIF; Ms. Easter's Title VII hostile work environment claim (Count II) against VDGIF; Ms. Carter's, Ms. King-Robinson's, and Ms. Easter's Title VII retaliation claims (Count III) against VDGIF; all of the Plaintiffs' § 1983 claims (Count IV) against Director Duncan; and, all of the Plaintiffs' claims against VDHRM (Counts I, II, III). The Court will also grant the motions to dismiss all counts brought by Ms. Easter, and all counts alleged against Director Duncan and VDHRM.

## A. Federal Rule of Civil Procedure 12(b)(6) Standard

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Martin*, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (omission in original) (quoting *Conley v. Gibson*, 355 U.S. 41,

19

47 (1957)).  Plaintiffs cannot satisfy this standard with complaints containing only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Instead, a plaintiff must assert facts that rise above speculation and conceivability to those stating a claim that is "plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Therefore, in order for a claim or complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citations omitted).

"If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998); *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985).  However, "a court may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint [without converting a Rule 12(b)(6) motion into one for summary judgment] so long as the authenticity of these documents is not disputed." *Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396–97 (4th Cir. 2006) (citing *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); *Gasner v. Cty. of Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995)).

The Plaintiffs attached the following to the Complaint: (1) an EEOC Letter to Ms. Carter dated June 6, 2016, (ECF No. 1-1); (2) an EEOC Letter to Dr. Conyers dated June 3, 2016, (ECF No. 1-2); an EEOC Letter to Ms. Easter dated June 6, 2016, (ECF No. 1-3); and, (4) an EEOC Letter to Ms. King-Robinson dated May 12, 2016, (ECF No. 1-4). The Court will consider the exhibits because the documents are central to the claims, are sufficiently referred to in the Complaint, and neither party contests their authenticity. *See Witthohn*, 164 F. App'x at 396–97 (citations omitted).

**B.    Carter and Easter Fail to State Title VII Race Discrimination Claims Against VDGIF (Count I)**

**1.    Stating a Claim for Race Discrimination Under Title VII**

Title VII prohibits an employer from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a). Under Title VII, there are two ways to prove discrimination: (1) through direct evidence; or, (2) through circumstantial evidence under the burden-shifting scheme established in *McDonnell Douglas v. Green*, 411 U.S. 792, 802–05 (1973); *see Spain v. Va. Commonwealth Univ.*, No. 3:09cv266, 2009 WL 2461662, at *7 (E.D. Va. Aug. 11, 2009)

"In the first method of proof, a plaintiff must provide 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Id.* (quoting *Rhodes v. FDIC*, 257 F.3d 373, 391–92 (4th Cir. 2001)). "Absent direct evidence, the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and[,] (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. App.*, 626 F.3d 187, 190 (4th Cir. 2010).

Importantly, the Supreme Court of the United States has found that, in order to survive a motion to dismiss for failure to state a discrimination claim, a plaintiff need not establish a prima facie case under the *McDonnell Douglas* standard. *See Swierkiewicz v. Sorema*, 534 U.S. 506, 512 (2002) ("Given that the prima facie case operates as a flexible evidentiary standard, it should not be transposed into a rigid pleading standard for discrimination cases."). The Fourth Circuit has reached the same conclusion in the age discrimination context. *See Craddock v. Lincoln Nat'l Life Ins. Co.*, 533 F. App'x 333, 336 (4th Cir. 2013) ("In *Swierkiewicz*, the Supreme Court rejected the notion that 'the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss.'" (citation omitted)).

Instead, the complaint must satisfy Federal Rule of Civil Procedure 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Stated differently, the complaint must allege facts "'that raise a right to relief above the speculative level'" that an employee suffered an adverse employment action because of the employee's membership in a protected class. *Coleman*, 626 F.3d at 190 (quoting *Twombly*, 550 U.S. at 555). Courts, nonetheless, "may look to the requirements of a prima facie case as a guide in assessing the plausibility of plaintiff's claim for relief." *Craft v. Fairfax Cty.*, No. 1:16cv86, 2016 WL 1643433, at *4 (E.D. Va. Apr. 26, 2016) (citing *Coleman*, 626 F.3d at 190); *see also McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 585 (4th Cir. 2015) (applying prima facie case as guide in motion to dismiss).[6]

---

[6] Tension appears to exist in the Fourth Circuit regarding how the *Twombly/Iqbal* pleading standard comports with earlier Supreme Court precedent in *Swierkiewicz*. In *Swierkiewicz*, the Supreme Court explained that courts should not transpose the evidentiary standard of *McDonnell Douglas* "into a rigid pleading standard for discrimination cases." 534 U.S. at 512. The Fourth Circuit has confirmed, as good law, that aspect of *Swierkiewicz*. *McCleary-Evans*, 780 F.3d at 585.

## 2. Carter and Easter Fail to Plausibly Allege Title VII Violations for Racial Discrimination, but Conyers Does[7]

First, a plaintiff may prove race discrimination under Title VII through direct evidence,

meaning the plaintiff must present evidence of conduct or statements that both: (1) "'reflect

---

In *McCleary-Evans*, a Title VII case, an African-American woman alleged that a state agency discriminated against her by refusing to hire her. In support, she stated that she was a qualified applicant and that she had been denied a position in favor of someone who was white. *Id.* at 583–84. She did not offer any comparison between herself and the individual hired. *Id.* at 584. In a 2-1 decision, the Fourth Circuit found that the plaintiff's allegations were fatally conclusory and lacked additional facts to support a reasonable inference that the decisionmakers were motivated by race. *Id.* at 586.

Despite acknowledging *Swierkiewicz* when so holding, the majority in *McCleary-Evans* required plaintiff to assert a "*plausible* claim for relief." *Id.* at 587. In a dissenting opinion, the Honorable James A. Wynn, Jr., suggested that the majority ignored the thrust of *Swierkiewicz*—"that discriminatory intent need not be pled with specific facts." *Id.* at 592 (Wynn, J., dissenting). Noting that the Fourth Circuit could not overturn either *Swierkiewicz* or *Iqbal*, Judge Wynn advocated an approach that more closely tracked *Swierkiewicz*, especially given the facts those cases examined:

> We are therefore confronted with two Supreme Court cases having apparent relevance to the case before us. One of these cases, *Swierkiewicz*, involves a Title VII plaintiff who alleged that his employer wrongfully terminated him due to his national origin. The other, *Iqbal*, involves a suspected terrorist who alleged that he was mistreated pursuant to an unconstitutional policy instituted by the United States Attorney General in conjunction with the Director of the Federal Bureau of Investigations. I have little difficulty deciding which case has greater applicability to the run-of-the-mill employment discrimination case before us.

*Id.* at 590; *see also McCauley v. City of Chi.*, 671 F.3d 611, 628–29 (7th Cir. 2011) (Hamilton, J., dissenting) ("[W]e must take care not to expand *Iqbal* too aggressively beyond its highly unusual context—allegations aimed at the nation's highest-ranking law enforcement officials based on their response to unprecedented terrorist attacks on the United States homeland—to cut off potentially viable claims.").

Although this Court does not follow the approach favored by Judge Wynn's dissent, discussing it helps frame the difficulty of applying the pleading standard of *Twombly* and *Iqbal* to cases in which "[t]he requisite proof of the defendant's discriminatory intent is often in the exclusive control of the defendant, behind doors slammed shut by an unlawful termination." *McCleary-Evans*, 780 F.3d at 592 (Wynn, J., dissenting). The Court also notes the obvious: that any motion to dismiss considered by a district judge must consider and apply *all* binding Supreme Court precedent.

---

[7] Defendants do not seek dismissal of Ms. King-Robinson's Title VII claim for racial discrimination against VDGIF.

directly the alleged discriminatory attitude;'" and, (2) "'bear directly on the contested employment decision.'" *Spain*, 2009 WL 2461662, at \*7 (quoting *Rhodes v. FDIC*, 257 F.3d 373, 391–92 (4th Cir. 2001)). Second, if proving discrimination through circumstantial evidence, the plaintiff must establish the following elements of a prima facie case: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and[,] (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. App.*, 626 F.3d 187, 190 (4th Cir. 2010).

The Defendants contend that Ms. Carter and Dr. Conyers fail to allege that race motivated VDGIF's conduct. With respect to Ms. Easter, the Defendants argue that she did not suffer an adverse employment action. For the reasons stated below, Ms. Carter and Ms. Easter each fail to plausibly allege claims for racial discrimination under Title VII. Dr. Conyers's allegations, however, sufficiently state a race discrimination claim. The Court addresses each plaintiff's race discrimination claim seriatim.

### a. Vonne Carter, Administrative Office Specialist/Human Resources Analyst

Regarding Ms. Carter, the Complaint plausibly alleges instances of purported discrimination she faced as an African-American woman in the VDGIF office. For example, Ms. Carter asserts that Colonels Watts and Henry treated her differently because of her race and that white employees "routinely ostracized" her.[8]

The Complaint, however, entirely omits any allegations *linking* Ms. Carter's termination to her race. Ms. Carter attributes her firing to Deputy Director Martel, but omits any assertion

---

[8] Ms. Carter includes allegations that a Caucasian employee refused to work with her because of her race, confusingly adding that she and the employee had "never even met." (Compl. ¶ 32.) Given that the employee in question had not met Ms. Carter, the most reasonable inference would be that the employee did not know that Ms. Carter is African-American. Without Ms. Carter alleging anything different, it is implausible that this employee's refusal to work with Ms. Carter could be the product of racial discrimination.

about *how* race influenced Deputy Director Martel's decision to terminate her. While she mentions a lack of warning and touts her own abilities, Ms. Carter fails to allege facts tying her termination to race rather than, for instance, gender. Without more, the Court cannot find that Ms. Carter plausibly states a race discrimination that survives a motion to dismiss. The Court will dismiss Ms. Carter's race discrimination claim under Title VII (Count I) against VDGIF.

### b.  Joice Conyers, Human Resources Director

Dr. Conyers's allegations, on the other hand, plausibly connect her termination to a decision influenced by her race. Dr. Conyers asserts that *after* she advised Director Duncan about her concerns regarding the lack of diversity in the office, Ms. Howe advised her that she was "auditing" the VDGIF department. VDGIF then launched an investigation, which allegedly had "the sole purpose of discrediting Dr. Conyers and other Black VDGIF human resources employees." (Compl. ¶ 51.) Dr. Conyers contends on information and belief that Director Duncan and others opened the "audit" or "investigation" as a "farce." (*Id.*) Thereafter, on or around July 8, 2014, Ms. Howe submitted her "audit" or "investigation" results, which led to the termination of Dr. Conyers. (*Id.* at ¶ 52.) Taking these allegations as true, and viewing them in the light most favorable to Dr. Conyers, she sufficiently alleges that VDGIF fired her because of her race.

### c.  Charlene Easter, Human Resources Analyst

Ms. Easter remains employed at VDGIF. By alleging that VDGIF refused to allow her to work a flex schedule or telecommute, Ms. Easter fails to allege that she suffered an adverse employment action to support her race discrimination claim. "An adverse employment action is a discriminatory act which 'adversely affect[s] 'the terms, conditions, or benefits' of the plaintiff's employment.'" *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (alteration in original) (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th

Cir. 2001)). Although "[c]onduct short of 'ultimate employment decisions' can constitute adverse employment action," *id.* at 375–76, Ms. Easter's circumstances do not rise to the level of an adverse employment action. Notably, Ms. Easter alleges no change in compensation, job title, level of responsibility, or opportunity for promotion—only a change in convenient access to files. *See Brockman v. Snow*, 217 F. App'x 201, 206 (4th Cir. 2007) ("A determination affecting Brockman's ability to work where she chooses is not the type of ultimate decision that this court has required for a prima facie case of discrimination."). Her complaints about difficulty in getting training are coupled with acknowledgement that she did, eventually, receive training. Accordingly, Ms. Easter fails to plausibly allege a Title VII race discrimination claim (Count I) against VDGIF, and the Court will grant the motion to dismiss that claim.

### C. Carter, Conyers, and King-Robinson State Title VII Hostile Work Environment Claims Against VDGIF (Count II), but Easter Does Not

#### 1. Alleging a Hostile Work Environment Claim Under Title VII

An employer contravenes Title VII by requiring an African-American employee to work in a racially hostile environment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–67 (1986). A hostile environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted).

Thus, to prevail on a Title VII claim that a workplace is racially hostile, "a plaintiff must show that there is '(1) unwelcome conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and[,] (4) which is imputable to the employer.'" *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011) (alteration omitted) (citation omitted).

## 2. Carter, Conyers, and King-Robinson Plausibly Allege Title VII Violations for Hostile Work Environment

The Defendants contend that the Plaintiffs fail to articulate facts sufficient to establish the second and third elements of a hostile work environment claim: that the conduct was based on the Plaintiffs' race and that the conduct was sufficiently severe or pervasive to alter the Plaintiffs' conditions of employment and to create an abusive work environment. The Court finds that Ms. Carter, Dr. Conyers, and Ms. King-Robinson plausibly allege both elements. Ms. Easter, however, cannot establish that she experienced the necessary level of unwelcome conduct as a result of her race.

### a. The Conduct Experienced By Carter, Conyers, and King-Robinson Was Based on Race

The Defendants argue that "the vast majority of [the] Plaintiffs' allegations of workplace hostility share the same infirmity: they are race-neutral." (Mem. Supp. Mot. Dismiss 14.) The Court disagrees as to Ms. Carter, Dr. Conyers, and Ms. King-Robinson.

#### i. Vonne Carter, Administrative Office Specialist/Human Resources Analyst

Ms. Carter's allegations of unwelcome conduct based on race survive a motion to dismiss. Ms. Carter articulates at least seven instances of race-based hostility.

Ms. Carter avers that her supervisor Colonel Watts often cursed and screamed at her, kicked office furniture, and stated repeatedly "I own you." (Compl. ¶¶ 26–27.) Colonel Watts did not treat white employees this way. Colonel Henry, another supervisor, treated Ms. Carter in a similarly disrespectful manner, regularly cursed at her, and referred to her as "gal" in a derogatory manner. Colonel Henry did not treat white employees this way. These do not constitute race-neutral allegations.

When another employee reported Colonel Watts's behavior, VDGIF opened an internal investigation during which Ms. Carter was placed on leave. Ms. Carter represents that after the investigation Colonel Watts received only a brief notation in his performance evaluation and received no formal discipline. Ms. Carter, on the other hand, was transferred to the Human Resources Department. She did not request this transfer and claims that the transfer occurred in order to "punish" her. (*Id.* ¶ 30.)

White employees at VDGIF "routinely ostracized" Ms. Carter, and declined to speak to her. (*Id.* ¶ 31.) One white employee even stated to Dr. Conyers that, "If [Ms. Carter] is coming down here, I am leaving. I will not share this space!" (*Id.* ¶ 32.) Ms. Carter claims, on information and belief, that "this employee's only objection to Ms. Carter was related to Ms. Carter's race."[9] (*Id.*) Moreover, Ms. Carter asserts denial of proper job training, which negatively affected her ability to perform her duties. Ms. Carter contends that the refusal to train stemmed from "a common understanding that Ms. Carter had made substantiated complaints of race discrimination and hostile work environment." (*Id.* ¶ 31.)

When VDGIF terminated Ms. Carter's employment, armed guards escorted her out of the building in a humiliating and uncommon manner. Ms. Carter maintains that her termination was "due to her race . . . and in retaliation for her legitimate complaints made about racial discrimination and a hostile work environment." (*Id.* ¶ 102.)

Considering these allegations together, taking them as true, and viewing them favorably to Ms. Carter, she alleges—sufficiently for purposes of a motion to dismiss—that such unwelcome conduct was based on Ms. Carter's race.

---

[9] As the Court noted previously, *see supra* note 8, it is unclear how this comment could have been based on Ms. Carter's race as the two employees had never met.

### ii.      **Joice Conyers, Human Resources Director**

The allegations pertaining to the unwelcome conduct experienced by Dr. Conyers also plausibly contend that the conduct was based on her race. Dr. Conyers describes at least nine instances of race-based hostility.

Dr. Conyers avers that white employees were routinely disrespectful and insubordinate to her. They challenged her authority and refused to perform tasks she assigned to them. White employees referred to her as a "blue card," intending to convey that VDGIF hired her because of her race and not her job qualifications. At a human resources retreat, white employees "balked" at diversity training and became upset when asked to participate. (Compl. ¶ 42.) They walked off the job without leave or permission. Ms. Carter and Ms. Easter routinely observed white employees speaking about Dr. Conyers derogatorily. Dr. Conyers further asserts that white employees filed false, racially-motivated complaints against her.

Dr. Conyers, the only minority director at VDGIF, was treated differently than other directors, who routinely excluded her from or did not advise her of important management meetings. All other non-African-American Directors consistently were invited to these meetings. Dr. Conyers served as the lowest-paid VDGIF director, receiving lower pay than similarly situated directors. She claims that this pay disparity was "due to her race as opposed to any legitimate reason." (*Id.* ¶¶ 44–45.)

When Dr. Conyers addressed employee insubordination and pay disparity with Director Duncan and Ms. Howe, they each refused to consider her concerns. Dr. Conyers also mentioned her disquietude about the lack of diversity in the office with Director Duncan, but he terminated the conversation without discussing the matter. This conversation was followed by "immediate retaliat[ion]" when Ms. Howe opened an audit of the VDGIF department "at the behest of . . . Director Duncan." (*Id.* ¶ 51.) Dr. Conyers claims that this investigation started "with the sole

29

purpose of discrediting Dr. Conyers and other Black VDGIF human resources employees, including the other Plaintiffs." (*Id.*) Further, Dr. Conyers claims that this investigation led to the termination of employment for her and for Ms. Carter. (Compl. ¶ 52.)

When she was placed on leave, armed officers escorted Dr. Conyers out of the building, which was an uncommon practice at VDGIF. In January 2015, VDGIF terminated Dr. Conyers's employment. She claims that this job loss was "due to her race . . . and in retaliation for [her] legitimate complaints made about racial discrimination and a hostile work environment." (Compl. ¶ 97.) Dr. Conyers does not describe these race-based events in an improperly conclusory manner.

Considering these several allegations as true, and viewing them in the light most favorable to Dr. Conyers, Dr. Conyers alleges—sufficiently to survive a motion to dismiss—that this unwelcome conduct was based on Dr. Conyers's race.

### iii. Carol King-Robinson, Boating Services Technician

Ms. King-Robinson's allegations of unwelcome conduct based on race also survive a motion to dismiss. Ms. King-Robinson alleges at least five instances of race-based hostility.

When she was promoted to Licensing Specialist in August 2014, VDGIF sent Ms. King-Robinson to a dirty office filled with trash and debris. After her promotion, Ms. King-Robinson experienced backlash when white employees complained that VDGIF hired and promoted "too many" African-American individuals. (Compl. ¶ 75.) A Caucasian human resources employee informed Ms. King-Robinson's coworkers that Ms. King-Robinson was "not a real supervisor." (*Id.* ¶ 77.) At odds with the general practice of the office before and after her tenure as a Licensing Specialist, Ms. King-Robinson's coworkers shunned her and kept their office doors shut. Ms. King-Robinson alleges that these white employees treated her this way because of her race.

After her demotion, Ms. King-Robinson approached Ms. Howe and EEO Representative Gardner to complain about her demotion and the circumstances surrounding it. Both Ms. Howe and Mr. Gardner discouraged Ms. King-Robinson from filing a grievance. Despite this, Ms. King-Robinson filed a grievance, which is still pending.

Considering the entirety of these allegations as true, and viewing them favorably to Ms. King-Robinson, she sufficiently alleges that she experienced unlawful conduct based on race to survive a motion to dismiss.

### iv. Charlene Easter, Human Resources Analyst

Ms. Easter's allegations, on the other hand, even taken as true and viewed favorably to her, cannot establish that she experienced unwelcome conduct based on her race. Ms. Easter mentions only two occurrences that conceivably could constitute unwelcome conduct, and neither of those situations shows race-motivated conduct by VDGIF. First, she asserts that VDGIF "ostracized and retaliated against her for questioning the racial fairness of the swimming requirement for officers," noting that Dr. Conyers and Ms. Carter observed this treatment. (Compl. ¶¶ 60, 103.) And second, she claims that VDGIF has "barred" or "blackballed" her from obtaining a position at other agencies because of, among other things, her race. (*Id.* ¶¶ 112–14.) Both allegations are entirely conclusory and cannot state a claim upon which relief can be granted. Moreover, Ms. Easter's contention that she observed others experiencing hostile acts does not, as alleged, plausibly assert a hostile work environment claim on her own behalf. The Court will grant the motion to dismiss Ms. Easter's hostile work environment claim (Count II) against VDGIF.

### b. The Conduct Was Sufficiently Severe or Pervasive

The Defendants submit that the facts underlying the Plaintiffs' hostile work environment claims represent nothing more than isolated comments or personality conflicts. Were the Court

to address each allegation separately, the Defendants' position might prevail. However, as explained below, the Court looks to the frequency of discriminatory conduct in assessing its severity and pervasiveness. In doing so, the Court finds that Ms. Carter, Dr. Conyers, and Ms. King-Robinson meet their pleading burden at this early stage, albeit barely so.

### i.   Meaning of "Severe or Pervasive"

The third element of a hostile work environment claim requires a showing that "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *See Harris*, 510 U.S. at 22. The plaintiff may, but is not required to, establish that the environment is "psychologically injurious." *Id.* Whether the environment is objectively perceived as hostile or abusive is "judged from the perspective of a reasonable person in the plaintiff's position." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). A court makes that determination "by looking at all the circumstances," which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. This "is not, and by its nature cannot be, a mathematically precise test." *Id.* at 22.

To be sure, viable hostile work environment claims often involve repeated conduct. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–17 (2002). That is because, "in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* at 115. For example, a "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (omission in original) (quoting *Meritor*, 477 U.S. at 67). The same goes for "'simple teasing' [and] offhand comments." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted). Importantly, however, an "isolated incident[ ]" of harassment can

32

"amount to discriminatory changes in the 'terms and conditions of employment,'" if that incident is "extremely serious." *Id.* (citation omitted).

### ii. The Pattern of Unwelcome Conduct Alleged is Sufficiently Severe and Pervasive to Survive a Motion to Dismiss

Here, Ms. Carter, Dr. Conyers, and Ms. King-Robinson each allege a *pattern* of discriminatory conduct that, "judged from the perspective of a reasonable person in [their] position[s]," *Oncale*, 523 U.S. at 81, sufficiently describes severe or pervasive unwelcome conduct. Combined, Ms. Carter, Dr. Conyers, and Ms. King-Robinson allege more than twenty discriminatory events. Further, on at least four occasions, Plaintiffs spoke to VDGIF management about discriminatory treatment and were ignored. Each of these three Plaintiffs also maintains that they observed many instances of discrimination, even if they were not the direct target of the conduct. Generally, Plaintiffs assert that they each "witnessed Caucasian employees being treated differently from, and better than, Black employees," "witnessed multiple instances of racially discriminatory treatment," and observed that "Black employees were subjected to discriminatory treatment and harassment that employees of other races did not experience." (Compl. ¶¶ 23–25.) While those statements lack specifics, the Plaintiffs elaborate on these claims elsewhere with sufficient particularity to bring them beyond "isolated comments" or "personality conflicts."[10]

Albeit narrowly, the allegations show a pattern of race-fueled remarks and conduct that, collectively, permit Ms. Carter's, Dr. Conyers's, and Ms. King-Robinson's hostile work environment claims to survive a motion to dismiss. While these contentions may not withstand

---

[10] The Plaintiffs cite no case law suggesting that witnessing discrimination can undergird a hostile work environment claim. For purposes of the Partial Motion to Dismiss, however, the Court will consider this argument alongside the substantial number of specific instances of race-based hostility Plaintiffs delineate in their Complaint.

the evidentiary rigor of a summary judgment motion or trial, the Court will not dismiss the claims at this early stage of litigation.

### D. Carter, Easter, and King-Robinson Fail to State Title VII Retaliation Claims Against VDGIF (Count III)[11]

#### 1. Stating a Retaliation Claim Under Title VII

To state a claim for retaliation under Title VII, "a plaintiff must provide factual allegations showing: (1) engagement in a protected activity; (2) an adverse employment action; and[,] (3) a causal link between the protected activity and the employment action." *Coleman*, 626 F.3d at 190.

Protected activities fall into two distinct categories: participation or opposition. *See* 42 U.S.C. § 2000e–3(a). Participation occurs when an individual "oppose[s] any practice made an unlawful employment practice by this subchapter." *Id.* "To qualify as opposition activity an employee need not engage in the formal process of adjudicating a discrimination claim. . . . Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

#### 2. Three Plaintiffs Do Not Plausibly Allege Title VII Violations for Retaliation

The Defendants contend that: (1) Ms. Carter and Ms. King-Robinson fail to allege that they engaged in protected activity; and, (2) Ms. Carter and Ms. Easter fail to allege a causal connection between any engagement in a protected activity and any retaliation by VDGIF. For the reasons stated below, Ms. Carter, Ms. King-Robinson, and Ms. Easter each fail to plausibly

---

[11] The Defendants do not seek dismissal of Dr. Conyers's Title VII claim for retaliation (Count III) against VDGIF.

allege claims for retaliation under Title VII. The Court addresses each plaintiff's race discrimination claim in turn.

### a. Vonne Carter, Administrative Office Specialist/Human Resources Analyst

The Complaint tersely alleges that Ms. Carter complained about discrimination and the hostile work environment at VDGIF. That action falls within the ambit of "participation" in protected activity. The Defendants, however, argue that such "threadbare" allegations cannot withstand scrutiny on a motion to dismiss for failure to state a claim. The Court need not settle that dispute. Instead, Ms. Carter's retaliation claim falters because she alleges nothing that establishes a causal connection between her engagement in a protected activity and her termination. The only protected activity Ms. Carter alleges she participated in was the filing of a "Dismissal Grievance" *following* her termination. (Compl. ¶ 101.) This protected activity post-dates the adverse employment action that Ms. Carter experienced (*i.e.*, the termination of her employment). It is therefore impossible for VDGIF to have terminated her in retaliation for this activity. Ms. Carter has not alleged a causal connection between a protected activity and her termination. The Court will grant the motion to dismiss Ms. Carter's retaliation claim (Count III) against VDGIF.

### b. Carol King-Robinson, Boating Services Technician

Similarly, Ms. King-Robinson makes no claim that she engaged in protected activity prior to the reversal of her promotion. Instead, Ms. King-Robinson suggests VDGIF prevented her from filing a grievance after her demotion occurred. According to the Complaint, Ms. King-Robinson complained to Ms. Howe and EEO Representative Gardner after she was demoted. Ms. Howe and Mr. Gardner discouraged her from filing a complaint or internal grievance, which Ms. King-Robinson nonetheless filed. Importantly, like Ms. Carter, the retaliatory conduct Ms.

King-Robinson alleges is the demotion, which occurred *before* she filed her grievance. She points to no other adverse action taken against her at any point *after* she filed her internal grievance. "Protected activity" that post-dates discriminatory conduct cannot support a claim for alleged retaliation flowing from that action. Because the Complaint omits allegations establishing this critical element, the Court will grant the motion to dismiss Ms. King-Robinson's retaliation claim (Count III) against VDGIF.

### c. **Charlene Easter, Human Resources Analyst**

Like Ms. Carter and Ms. King-Robinson, Ms. Easter omits any allegations establishing a causal connection between her purported engagement in a protected activity and the retaliatory employment action. Ms. Easter points to two instances of purported protected activity. First, she questioned the racial fairness of VDGIF's swimming requirements for officers; and second, she openly assisted Ms. Carter in filing a grievance after Ms. Carter's termination. With respect to both events—even presuming that denial of a flexible schedule could be an adverse action— Ms. Easter makes no mention of whether the individual who refused to accommodate her schedule request *knew* about her engagement in those protected activities. Certainly that would be true as to applications sent to other Virginia agencies. At best, Ms. Easter contends that she engaged in a protected activity for Ms. Carter at some point prior to an employment action. But the Court has no basis to make the inferential leap that VDGIF punished Ms. Easter *because of* her engagement in a protected activity. Indeed, "[i]t is imperative that the employer understand that the employee is engaging in opposition activity because the decision maker's knowledge of the protected activity is 'essential to a retaliation claim.'" *Jenkins v. Mid-Atl. Detailing*, No. 3:16cv188, 2016 WL 6775694, at *5 (E.D. Va. Nov. 15, 2016) (citation omitted), *aff'd*, 689 F. App'x 191 (4th Cir. 2017). The Court will grant the motion to dismiss Ms. Easter's retaliation claim (Count III) against VDGIF.

### E.    The Plaintiffs Fail to State § 1983 Claims Against Duncan (Count IV)

The Plaintiffs bring discrimination, hostile work environment, and retaliation claims against Director Duncan in his individual capacity under 42 U.S.C. § 1983, which provides a private right of action for a violation of federal rights by persons acting under the color of state law.

> Section 1983 . . . "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." . . . Hence, to establish liability under Section 1983, a plaintiff must show that the defendant, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury.

*Brown v. Mitchell*, 308 F. Supp. 2d 682, 692 (E.D. Va. 2004) (citations omitted).

Generally, to establish § 1983 liability against an officer in his or her personal capacity, "a plaintiff must affirmatively show that the 'official charged *acted personally* in the deprivation of the plaintiff's rights.'" *Oliver v. Powell*, 250 F. Supp. 2d 593, 598 (E.D. Va. 2002) (emphasis added) (quoting *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985)). The Plaintiffs, accordingly, "may not avail [themselves] of the doctrine of respondeat superior, as [the] doctrine is inapplicable to § 1983 claims." *Id.*

In spite of the well-settled premise that § 1983 liability cannot arise from respondeat superior, the Plaintiffs allege almost no involvement by Director Duncan in the underlying matters. In essence, the Plaintiffs contend that, based on his position as Executive Director at VDGIF, Director Duncan should bear legal responsibility for the claims that arose during his tenure. The Plaintiffs specifically contend that Director Duncan "had an obligation to maintain a work environment that was not charged with racial discrimination and hostile to [the] Plaintiffs and other minority employees." (Compl. ¶ 160.) In other words, the Plaintiffs argue—in a conclusory fashion—that Director Duncan had responsibility to ensure that none of his subordinates violated federal law. The Court cannot reconcile that flat allegation with the

requirement that a § 1983 plaintiff "affirmatively show that the 'official charged *acted personally* in the deprivation of the plaintiff's rights.'" *Oliver*, 250 F. Supp. 2d at 598 (quoting *Wright*, 766 F.2d at 850). The Court will grant the Defendants' motion to dismiss the § 1983 claim against Director Duncan in his individual capacity (Count IV).

### F.      The Plaintiffs Fail to State Any Claims Against VDHRM (Counts I, II, III)

Finally, the Plaintiffs fail to state a claim against VDHRM for their Title VII race discrimination, hostile work environment, and retaliation claims. The Plaintiffs vaguely allege that VDHRM and its employees acted as agents of VDGIF. The Plaintiffs assert, as a result, that VDHRM had control over some aspects of the Plaintiffs' employment, including compensation, terms, conditions, and privileges. The Plaintiffs further contend that VDGIF requested actions by VDHRM and that VDGIF ratified investigations that VDHRM conducted. However, the Plaintiffs allege no independent authority of VDHRM that could render VDHRM liable under Title VII. Nor do they outline parameters of control exercised by VDHRM that, even viewed favorably, plausibly show that VDHRM controls employees within VDGIF.

"An entity can be held liable in a Title VII action only if it is an 'employer' of the complainant." *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015). "[M]ultiple entities may simultaneously be considered employers for the purposes of Title VII," *id.* at 410, but only when "multiple entities *control* an employee," *id.* at 409 (emphasis added). In assessing whether an employer *controls* an individual jointly with another employer, the Fourth Circuit looks to nine factors:

> (1) authority to hire and fire the individual; (2) day-to-day supervision of the individual, including employee discipline; (3) whether the putative employer furnishes the equipment used and the place of work; (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes; (5) the length of time during which the individual has worked for the putative employer; (6) whether the putative employer provides the individual with formal or informal training; (7) whether the individual's duties are

38

akin to a regular employee's duties; (8) whether the individual is assigned solely to the putative employer; and[,] (9) whether the individual and putative employer intended to enter into an employment relationship.

*Id.* at 414. Each Plaintiff fails to allege any facts about VDHRM that fall within the *Butler* test. At best, the Plaintiffs contend, without specifics, that VDHRM assisted VDGIF in *managing aspects* of the Plaintiffs' employment. Such allegations, however, do not bring VDHRM within the definition of a Title VII "employer." Accordingly, the Court must grant the motion to dismiss the Plaintiffs' Title VII claims (Counts I, II, III) against VDHRM.

### IV. Conclusion

For the foregoing reasons, the Court will deny the Motion to Disqualify and grant in part the Partial Motion to Dismiss.

An appropriate Order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Richmond, Virginia
Date: 9/29/2017